**In re Phenylpropanolamine (PPA) Litigation**

*Sol Weis, Martin Rubenstein, Lee Balefsky* and *Michael Weinkowitz,* for plaintiffs.
*Albert Bixler* and *Andy Trevelise,* for defendants.

ACKERMAN, *J.,* September 2, 2003—

## INTRODUCTION

### A. Trach *As the Legal Guide to the Use of Extrapolation As a Generally Accepted Methodology To Satisfy* Frye

This court is guided by the opinion of the Superior Court of Pennsylvania en banc by the Honorable Judge Ford Elliott in the case of *Trach v. Thrift Drug Inc.,* 817 A.2d 1102 (Pa. Super. 2003).

The *Trach* case involved a negligence action brought by a customer against a pharmacist arising from cognitive and vision problems the customer developed, allegedly resulting from taking medication that was erroneously dispensed to him by the pharmacist. The majority of the *Trach* court held that the *Frye* test governing the admissibility of expert testimony only applies to determine if the relevant scientific community has *generally accepted principles and methodology* that the scientist employs and *not conclusions the scientist reaches* before the court may allow an expert to testify.

In the *Trach* case, the customer's expert witness used the methodology of extrapolation to deduce that the customer's chronic symptoms, including glaucoma, were the result of a massive overdose of Doxepin. The *Trach* court held that the methodology of extrapolation, in the context of the case before it, was generally accepted in the scientific community and thus the testimony in question was admissible.

The *Trach* court emphasized that *"Frye* is an exclusionary rule of evidence" and that "as such, it must be construed narrowly so as not to impede admissibility of

evidence that will aid the trier of fact in the search for truth." See Pa.R.E. 702, 42 Pa.C.S., but "noting that Rule 702 does not alter Pennsylvania's adoption of the *Frye* standard." (At 1102.)

In the *Trach* case, it was noted that Doxepin when taken in the *recommended* dosage may result in blurred vision, confusion, disorientation and hallucinations. (emphasized by the court) (At 1104.) In *Trach,* there had been no proposed studies to determine the effect of a massive dose of Doxepin, such as the dose *Trach* took.

Dr. Shane was *Trach's* expert witness who relied upon clinical trials prior to the approval of the drug by the FDA and also from clinical experience since the drug had been on the market, as well as from the side effects and contraindications for a therapeutic dose as noted in the PDR. Dr. Shane also testified as to the mechanism that leads to glaucoma.

The *Trach* court reviewed a dissent by Justice Castille in the case of *Blum v. Merrell Dow Phamaceuticals Inc.,* 564 Pa. 3, 764 A.2d 1 (2000) at 7-8, and notes that the testimony in the *Blum* case "demonstrates how 'scientific consensus' can be created through purchased research and the manipulation of a 'scientific' literature funded as part of litigation defense, and choreographed by counsel" rather than from the required objective evidence.

The *Trach* court held that Dr. Shane employed the generally accepted principle of the " 'dose-response,' a principle 'as old as the pyramids.' "

Finally, *Trach* held that "extrapolation is one of the methodologies Dr. Shane used to conclude that a massive overdose of Doxepin could result in permanent and/or

exacerbated adverse effects documented at the recommended dose, is not science: in fact, it is a logical method used to 'estimate the value of a variable outside its tabulated or observed range' or 'to infer (that which is not known) from that which is known,' Webster's 505. The question then becomes whether extrapolation, although not science, is a methodology generally accepted and used by scientists within the relevant scientific community." (At 1114.)

*Trach* cited the case of *Donaldson v. Central Illinois Public Service Co.,* 199 Ill. 2d 63, 262 Ill. Dec. 854, 767 N.E.2d 314 (2002), as persuasive authority while not binding precedent as follows: "As the *Donaldson* court observed, 'extrapolation is commonly used by scientists in certain limited instances . . .'; for example, when the medical inquiry is new or the opportunities to examine a specific cause and effect relationship are limited; when the number of cases limits study of the disease, or, as noted *supra,* when ethical considerations prevent exposing individuals to a toxic substance for research purposes. *Id.* at 85, 87, 262 Ill. Dec. 854, 767 N.E.2d at 328, 330. According to the *Donaldson* court, when an expert relies upon scientific literature discussing similar, but not identical, cause and effect relationships, the fact that the expert must extrapolate affects the weight of the testimony rather than its admissibility. *Id.* at 85, 262 Ill. Dec. 854, 767 N.E.2d at 328. (citation omitted)" (At 1115.)

*Trach* further cites *Donaldson,* which stated that "the method of extrapolation does not concern a technique new to science that may instill a sense of 'false confidence' or carry a misleading sense of scientific 'infallibility.' *Id.* at 86, 262 Ill. Dec. 854, 767 N.E.2d at 329.

(citation omitted) As the *Donaldson* court continued, '[E]xtrapolation by nature admits its fallibility—the lack of specific support to establish the existence of a known cause and effect relationship.' *Id.* at 87, 292 Ill. Dec. 854, 767 N.E.2d at 329. (citation omitted)" (At 1115-16.)

The court also cited the case of *Ferebee v. Chevron Chemical Co.,* 736 F.2d 1529 (D.C. Cir. 1984), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), as follows: "As long as the basic methodology employed to reach such a conclusion is sound, such as use of tissue samples, standard tests, and patient examination, products liability law does not preclude recovery until a 'statistically significant' number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies of the chemical." (At 1116.)

The *Trach* court, after reviewing *Donaldson, supra,* and *Ferebee, supra,* stated as follows: "We find the facts of this case even more compelling than the facts of *Ferebee, supra,* or *Donaldson, supra,* based on the *even stronger logical inference* that a substance known to cause adverse side effects in its recommended dose is likely to cause a heightened level of the same or similar adverse effects when taken in a massive overdose." (emphasis supplied) (At 1116.)

Accordingly, if there is a strong logical inference to support extrapolation, which is a generally accepted methodology, then *Frye* will be satisfied.

### B. *HSP Report Relevant Conclusions*

We next will examine Phenylpropanolamine & Risk Of Hemorrhagic Stroke: Final Report Of The Hemor-

rhagic Stroke Project as it affects the gender-related issue to be discussed *infra.*

In the Discussion section of that report which contains the *conclusions* derived from all of the results of the Statistical Analysis section, the final conclusion as to the applicability of the study of men is set forth as follows: "Because so few men were exposed to PPA in the HSP (n=19), we were unable to determine if their risk for hemorrhagic stroke (with use of PPA) is different from that of women." (At p. 22, final report.)

The above conclusion was reached notwithstanding the following statement contained under the section entitled Sample Size as follows: "Because our research interest extended to men and to exposures other than PPA, we doubled our sample size to include 350 men and 350 women for a total of 700 case subjects and 1,400 controls." (At p. 12, final report.)

## I. PPA Increases the Risk of Hemorragic Stroke in the Female Population Over the Age of 49 Years

All parties agree that "There were *no* data or findings reported in the HSP applicable to . . . women . . . greater than 49 years old." (See affidavit of Ralph L. Sacco M.D., M.S., paragraph 57.)

Dr. Sacco argues that "HSP findings cannot be extrapolated to ages not studied in the HSP . . . Subarachnoid Hemorrhagic Stroke (SAH) represents a greater proportion of all strokes in younger people than in older people." (Sacco affidavit, paragraph 58.)

Dr. Sacco further states (paragraph 58) that "Moreover many, if not all, of the modifiable risk factors for . . .

SAH are known to create increasing health consequences over time, *i.e.,* cigarette smoking, alcohol abuse, diabetes, chronic hypertension, etc." Accordingly, the defendants primarily argue and point to the fact that the risk of stroke increases as age increases. However, there is a strong logical inference that as a woman ages, she becomes more susceptible not only to stroke but to PPA which has already been shown to increase the risk of stroke in younger women.

This court does not see any reason either to reject the strong logical inference to utilize extrapolation from the HSP study of females *under* the age of 49 years (already accepted by the court), or to conclude that the increasing risk of stroke would render the HSP unreliable as applied to this age group.

The FDA found no reason to believe the risks posed by PPA were limited to individuals within the age range studied in the HSP.

Thus, this court finds testimony by plaintiffs' experts that PPA increases the risk of hemorrhagic stroke in the female population over the age of 49 years to be admissible under *Frye* in that the methodology of extrapolation here based upon the aforesaid strong logical inference is generally accepted in the scientific community and, therefore, *Frye* is satisfied.

## II. PPA Increases the Risk of Hemorrhagic Stroke in the Male Population 18 Years of Age and Older

All parties agree that "There were *no* data or findings reported in the HSP applicable to men." (See affidavit of Ralph L. Sacco M.D., M.S., paragraph 57.)

It is true that plaintiffs rely on a smaller number of case reports directly related to men, but *Donaldson, supra,* and approved by *Trach,* approves of extrapolation in this regard.

Defendants also highlight differences between men and women. It is true that the incidence rate of stroke, type of stroke and some of the risk factors for stroke vary between these groups.

Plaintiffs' experts concede the aforesaid differences but maintain that these subpopulations share far more similarities than differences.

At the outset, it must be noted that the FDA did not differentiate between men and women.

Plaintiffs' experts attest to the commonplace practice of extrapolation between the genders based upon, in significant part, the historical exclusion of women from scientific studies. (See *Trach* and reasons for extrapolation, *supra.*)

Defendants' expert, Dr. Hopkins, notes current studies accounting for the differences between men and women, but does not suggest that this very recent shift has yet effectuated a change in the practice of extrapolation.

Plaintiffs' experts stress that in either gender strokes are an "uncommon adverse reaction" (Dr. Feldman) and that only the "outliers" in the population are at risk.

Dr. Feldman was a co-investigator of the HSP. Dr. Feldman's testimony is based upon his own clinical research, experience, education, the HSP, medical literature and case reports.

Plaintiffs' experts maintain the need for extrapolation given the unsurprisingly smaller amount of evidence di-

rectly relating to the male outliers. Dr. Feldman, plaintiffs' expert, testified that extrapolating is done frequently from men to women and women to men.

Dr. Feldman, one of plaintiffs' experts, testified that he never saw any textbook or peer-reviewed article which stated that men were not at risk for stroke but women are. (Preservation deposition, TR 552, 553.) Dr. Feldman categorically testified that PPA is capable of causing hemorrhagic stroke in men based upon his clinical practice, in research and in writing. Dr. Feldman testified that decongestant action constricting the blood vessels which relates to hemorrhage is not limited to women. Toxicity is not limited to men and not women. There are tremendous and overwhelming similarities between men and women and effects of PPA usage and stroke as follows:

Increases in blood pressures, one could not distinguish between arteriorogram of men and women to distinguish diseases stated Dr. Feldman and "as a general rule there is no exclusivity by gender and by and large no differences except exposure and anatomical differences." In reference to drugs, Feldman testified that as a general rule there is the same effect in men and women. *Absolute* and *exclusive* differences are not the rule. Effect on women and on men is a difference only in degree. Hemorrhagic stroke is not seen in one sex and not in another.

Women are at greater risk to hemorrhagic stroke than men, Feldman concedes, but states that clinical, human physiology and animal studies of men and women disclose both sexes at risk from surge in blood pressure, constricture of blood vessels, constricture of arteries and that PPA was seen in both sexes both before and after bleeding. Both men and women experience vasospasm

and bleeding, both present where hemorrhagic strokes occur, even though the bleeding occurs in some places in women and different places in men.

Dr. Feldman, under cross-examination (Preservation deposition, TR 224), discussing one of his case reports concerning a male 21 years old and obese, testified that he concluded from this case report that "PPA is an independent risk factor for brain bleeding as was alcohol abuse by this male. . . . this is not a patient who had one risk factor for brain bleeding. This patient had several risk factors for brain bleeding and multiple risk factors don't protect you from brain bleeding. They just increase the risk even further and they're additive." (Preservation deposition, TR 224, 547, 548.) This was the one case which had control. (Preservation deposition, TR 225.) There were five other cases in all in a five-year study, and the total of six also had other independent risk factors for brain bleeding. (Preservation deposition, TR 227, 228.)

Dr. Feldman testified on redirect that "the FDA looked at the multiple risk factor cases and were very satisfied with the adjustments we made" (for those multiple factors). (Preservation deposition, TR 549.)

"Hormones may explain *some of the difference in risk that we observe between men and women.*" (Preservation deposition, TR 232.) (emphasis supplied)

Thus, the differences between men and women are differences mainly in degree, and this court finds that extrapolation from the HSP study from women to men is a generally accepted methodology based upon the strong, logical inference supported by both reason and academic

literature and case reports. Accordingly, there is an objective basis here for extrapolation.

Accordingly, *Frye* is satisfied and plaintiffs' expert may testify that PPA increases the risk of hemorrhagic stroke in the male population 18 years of age and older.

### III. PPA Increases the Risk of Ischemic Stroke in Any Segment of Our Society

Unlike the discussion about sub-population groups based upon age and gender, we now examine the applicability of a form of extrapolation from data and scientific knowledge as they relate to a type of stroke different from the hemorrhagic stroke covered in the HSP report, to wit: ischemic stroke.

All parties agree that the comparison approach utilized by plaintiffs in which they compare PPA, a drug known as *sympathomimetic,* with other drugs in that group, is a form of extrapolation.

Dr. Feldman frankly testified that he has not yet arrived at a final opinion as to whether PPA can cause ischemic stroke. (TR 39, line 24.) However, that is the *conclusion* about which some plaintiffs' experts wish to testify and *Trach, supra,* directs us not to consider the general acceptance of *conclusions* but only *methodology* and *principles.*

Ischemic stroke accounts for 75-80 percent of all strokes (Dr. Levine). Many people who experience ischemic stroke suffer from other health problems or conditions, such as high blood pressure or hypertension and heart disease. Other factors that increase a person's risk of ischemic stroke are gender, race and age. Sometimes

the deposits of cholesterol narrow the arteries so much that blood cells may collect and form clots. Ischemic strokes can be caused when these *blood clots block an artery.* If the blockage occurs in an artery or occludes a blood vessel leading to the brain, a thrombotic stroke or cerebral infarction can occur. Sometimes a blood clot is formed within an artery outside the brain. If this blood clot dislodges, travels within the bloodstream, and becomes trapped in an artery closer to the brain, an embolic stroke can occur.

A hemorrhagic stroke occurs when there is *release of blood* by the sudden *rupture* of an artery within or surrounding the brain. There are two types of hemorrhagic stroke: intracerebral and subarachnoid. Intracerebral hemorrhage occurs when an artery within the brain bursts, allowing blood to leak within the brain. The release of blood in the brain increases pressure within the brain and can damage the brain cells surrounding the released blood. The most common cause of intracerebral hemorrhage is hypertension. Subarachnoid hemorrhage occurs when an artery near the brain ruptures and fills the area surrounding the brain with blood. The release of blood, as in an intracerebral hemorrhage, creates an increase in pressure and can damage the brain cells surrounded by the blood.

PPA is a sympathomimetic amine, which means that it stimulates the sympathetic nervous system by mimicking the effects of molecules that regulate the system. The sympathetic nervous system is one part of the autonomic nervous system; the parasympathetic nervous system is the other part. The autonomic nervous system is automatic, *i.e.,* it cannot be controlled by the mind. These

systems work in balance with each other and directly or indirectly affect the body. The sympathetic nervous system has an active pushing system; the parasympathetic has a relaxing function.

Both plaintiffs' and defendants' experts discussed the pharmacology of PPA. Specifically, sympathomimetic amines are similar in structure to norepinephrine, which is found in the brain and is the primary neurotransmitter in the sympathetic nervous system. Norepinephrine controls "fight or flight" reactions. Sympathomimetic amines are also similar in structure to epinephrine, which is a brain neurotransmitter and a major hormone in the body. Both norepinephrine and epinephrine are both catecholamines produced by the body to regulate the nervous system.

Amphetamine, ephedrine, cocaine and PPA are examples of sympathomimetic amines. Sympathomimetic amines have similar chemical structures. For example, PPA's structure is nearly identical to amphetamine; but PPA has a particular carbon hydroxl group that amphetamine lacks. However, sympathomimetic amines *are not identical* and, consequently, may produce different effects or may be more or less potent. For example, PPA is far less potent than amphetamine.

Common effects of the "fight or flight" response are increases in heart rate, increases in blood pressure, dilation of the trachea and bronchi, pupil dilation and increases in blood flow to the brain, heart and skeletal muscles, and decreases in blood flow to the skin and internal organs.

Defendants argue that the effects of PPA are not *identical* to those of other sympathomimetic drugs. "Rela-

tively minor modifications in the molecule may result in major changes in pharmacological properties." (Louis S. Goodman et al., *The Pharmacological Basis of Therapeutics* 32 (10th ed. 2001)).

Defendants maintain that PPA's properties differ from those of other sympathomimetic drugs that are generally accepted risk factors for stroke. One significant reason for this difference, according to the defendants, is that PPA is substantially less potent than other sympathomimetic drugs. Defendants suggest that the differences between PPA and other sympathomimetic drugs do not permit extrapolation under *Frye* and *Trach.*

Next the defendants highlight that acute increases in systemic blood pressure is a well-accepted means of preventing ischemic stroke following a hemorrhagic stroke. Defendants also note that blood pressure increases equal or greater than those reported in studies cited by plaintiffs occur during normal daily activity. The autoregulatory system, according to the defendants, is equipped to handle these routine blood pressure increases. Defendants proffer that the autoregulatory system must also be capable of handling blood pressure increases following ingestion of PPA.

Plaintiffs' experts rely upon the similarities of PPA's structure to that of other sympathomimetics including amphetamine and cocaine. Toxicologists and pharmacologists routinely consider an observed effect of similar drugs to infer that other similar drugs may also cause the same effect because scientists, recognize that similar chemicals may have similar properties, according to the plaintiffs.

In this case, plaintiffs claim that PPA and other sympathomimetic drugs cause similar side effects, including elevation in blood pressure, headache, stroke, seizure, psychic disturbances, and death. Defendants concede that PPA is a sympathomimetic that can cause elevations of blood pressure at particular levels but argue that although PPA may have some properties of other sympathomimetics, it also has subtantial differences. Plaintiffs agree with the defendants that all sympathomimetic drugs do not produce all of the same side effects. However, plaintiffs in opposition state that it is accepted that these drugs constrict blood vessels and cause strokes. In particular, plaintiffs explain that PPA and other sympathomimetic drugs can cause transient and diffuse constrictions or isolated rings of contraction in blood vessels. When viewed on a cerebral angiogram with radio-opaque dye, these constrictions can look like a string of beads—hence the term "beading." Beading has been observed with many sympathomimetic drugs, including PPA. These observations have been published in peer-reviewed literature. See *e.g.*, Carlos S. Kase et al., *Intracerebral Hemorrhage, in Neurology in Clinical Practice: The Neurological Disorders,* 1032-47 (2d ed. 1996).

Moreover, plaintiffs point out that analogizing one drug to other similar drugs is routinely performed in certain scientific disciplines, *e.g.*, toxicology and pharmacology. The plaintiffs conclude by offering that their experts' use of this technique is appropriate in this case.

Plaintiffs' experts also rely on human clinical trials; *e.g.*, Paul R. Pentel, *Toxicity of Over-the-Counter Stimulants,* 252 JAMA 1898 (1948); J.D. Horowitz et al., *Hypertensive Responses Induced by Phenylpropanolamine*

*in Anorectic and Decongestant Preparations,* 8159 The Lancet 60, 61 (1980); Steven C. Dilsaver et al., *Complications of Phenylpropanolamine,* 39(4) Am. Fam. Physician, 201, 201-206 (1989). The most common adverse effect of PPA in these clinical trials was a sudden rise in blood pressure.

Physicians, according to plaintiffs, routinely use differential diagnosis as a method of opining on causation of a disease. Differential diagnosis is a process by which different possible causes or risk factors for a disease are systematically considered, tested for and ruled in or ruled out. Plaintiffs suggest that differential diagnosis is an appropriate methodology when opining on causation of a disease regardless of whether the opinion is reached for expert testimony or patient treatment.

Today 10 causality factors are often used to assess causality: consistency, congruence, strength of association, sensitivity, specificity, temporality, dose-response, plausibility, experiments and research, and analogy. Plaintiffs argue that their contention that PPA causes stroke can be supported by several of these factors.

Plaintiffs assert that it is biologically plausible that PPA causes stroke through vasoconstriction. The plaintiffs claim that the evidence suggests coherence. Plaintiffs assert that PPA is structurally and biologically analogous to other sympathomimetics that are generally accepted to cause stroke.

Plaintiffs present Dr. Steven Levine as an expert. Dr. Levine is a highly qualified neurologist who specializes in stroke. His education, experience and training focus on stroke. There is no dispute that Dr. Levine is qualified as an expert in the field of neurology.

Dr. Levine is a board certified neurologist and is a professor of Neurology and Director of Cerebrovascular Education at the Mount Sinai School of Medicine and Medical Center in New York City. He was previously the Detroit area principal investigator for the National Institute of Health and served as a co-chair of both the Michigan Stroke Initiative and the America Stroke Association Operation Stroke Detroit. Dr. Levine has also treated numerous patients who have had strokes during his medical career.

Dr. Levine has published his opinions that sympathomimetic drugs, including PPA, can cause strokes. Dr. Levine's first published opinion about sympathomimetics, including PPA, was published in the early 1990s.

Dr. Levine, in reaching his conclusions regarding PPA relied upon the kinds of facts and data that stroke neurologists rely on in the course of their academic and clinical work. Dr. Levine highlighted the evidence that he relied upon in reaching his opinion. Dr. Levine explained,

"So there are about 10 kinds of evidence that sort of, if you will, all converge or point to one direction with regard to supporting . . . my opinion that PPA in select individuals can cause an infarct. These lines of evidence are case reports that are published that are peer reviewed in the medical literature. Short series, two cases that are included in that, adverse events, adverse drug reports that were reported to the FDA. Animal studies with sympathomimetics. Clinical structure, function, and pharmacological class that are similar with PPA to amphetamines and ephedrine. And there's some analogy as well to naturally occurring conditions that altered sympathetic tone, where there's a disruption of the sympathetic nervous

system. . . . There's literature on similar drugs of the same class that have the same mechanisms of action. Similar mechanisms of action. There's biological plausibility based on a class of drug. The fact that PPA has a narrow therapeutic index. Human blood pressure experiments. Multiple textbooks. And in fact not just my personal experience, but also other stroke neurologists around the country's personal experience as well."

This scientific literature and scientific evidence, as Dr. Levine testified, is the same evidence that stroke neurologists rely upon everyday.

Dr. Levine concluded that, "given that sympathomimetics are known to be a vasoconstrictor and affect cerebral vessels, then I think there is biological plausibility in the tenet that PPA can cause ischemic stroke, fits well and nicely within biological plausibility." Dr. Levine also testified that, "If you look at the reports and personal experience, and textbooks, at the epidemiological studies, there is a temporal association with the medication, or the drug, and the effect. And also dose response, where higher doses are more likely to cause adverse events in question." In reaching this conclusion, Dr. Levine focused on PPA's ability to constrict the vessels and reduce blood flow.

Dr. Levine also recognized that sympathomimetic drugs vary in some significant ways, in particular, potency:

"Q. And you would agree, of course, doctor, that the effects of PPA are not identical to the effects of cocaine?

"A. I think that they're not the same drug, but they have similar effects in terms of some of their pharmacology. They both can raise blood pressure. They both can

vasoconstrict. Cocaine is much more [central nervous system] active than PPA is. So, yes, they're different drugs. Cocaine is on a potency level much more potent than PPA is, but they do share similar pharmacological effects, because they have similar sympathomimetic action."

Dr. Levine refers to Koch's Postulates:

"(1) Biological plausibility/known drug effects;

"(2) Temporal association to stroke;

"(3) Dose response—higher doses more likely to cause strokes."

Dr. Levine's references to top neurologists specializing in stroke shows wide acceptance but not necessarily general acceptance of his conclusions.

Dr. Levine testified that if you take an angiogram soon enough, and if the ischemic stroke is bad enough, you will see clot obstruction in 85 percent of ischemic stroke cases.

Dr. Levine's level of proof is a Grade D in *concluding* that PPA causes ischemic *stroke.*

Dr. Levine cites the following textbooks and other materials in support of his methodology:

"(1) *Caplan's Stroke, A Clinical Approach* (supporting clinical decision-making based on anecdotal experiences and intuition—reviewed favorably by Gregory W. Albers M.D. et al.).

"(2) *Rosen's Emergency Medicine Concepts and Clinical Practice* Fifth edition—Chapter 95 Stroke

"Recreational drugs such as cocaine, phenylpropanolamine and amphetamines are potent vasoconstrictors associated with both ischemic and hemorrhagic stroke.

"(3) *Ischemic Cerebrovascular Disease* by Adams M.D., Hachinski M.D. and Norris M.D.

"Among persons abusing drugs, stroke can be secondary . . . to drug-induced vasoconstriction of the cerebral vessels, a vasculitis, or marked by elevated blood pressure.

"Ischemic stroke is most commonly described with the abuse of cocaine and amphetamines.

"Stroke is a potential complication of other medications that have vasoconstrictive properties. Among the medications that have been implicated are phenylpropanolamine and ephedrine . . . The former agent is a component of medications that are used to suppress appetite or to rhinitis (decongestant), whereas ephedrine is available as a prescribed stimulant. Young patients should be asked about recent use of these medications.

"(4) *Vasculitis* by Gene V. Ball et al.

"Drugs, particularly those with sympathomimetic properties, have been associated with a myriad of neurologic problems including cerebral infarcts, intracerebral bleeding and subarachnoid hemorrhage. The most commonly implicated drugs are oral intravenous amphetamines, cocaine, heroin, ephedrine and phenylpropanolamine.

"(5) *Experimental and Clinical Neurotoxicology* by . . . Herbert H. Schaumburg M.D. et al.

"Abuse or overtreatment with agents with vasopressor/constrictor side effects (ergotamine, amphetamine, phenylpropamine, cocaine) can precipitate cerebral vasospasm or hemorrhage.

"(6) *Stroke and Substance Abuse* by John C.M. Brust

"Amphetamine-like psychostimulants include dextro-amphetamine, methamphetamine, methylphenidate (Ritalin), ephedrine, pseudoephedrine, phenylpropano-lamine, and a large number of other agents marketed as decongestants or appetite suppressants. Ischemic or hemorrhagic stroke is a well-recognized complication of these drugs.

"Amphetamine-induced cerebral vasculitis has also caused ischemic stroke."

Dr. Gregory William Albers, defendants' expert, agrees that there are sources linking PPA to ischemic stroke but disagrees with them. He agrees that leading textbooks state as medical knowledge that PPA can cause ischemic stroke.

Dr. Thomas Michel, a defense expert in adrenergic pharmacology, a practicing cardiologist and board certified in internal medicine and cardiology, testified that PPA is a weak vasoconstrictor and a very, very weak alpha-1 adrenergic agonist, *but states that he "is not sure that there is a very substantive signal there"* that if PPA were to work in conjunction by releasing more norepinephrine, then PPA itself becomes a better stimulator. (TR pp. 99, 100.)

Dr. Michel also testified "that the definitive identification of a reproducable drug effect of a *large* change in blood pressure was not documented." (TR p. 105.) (emphasis supplied) Thus, it appears that the effect of PPA is not disputed but only the degree of the effect.

Finally, Michel admits on cross-examination that it is "common knowledge" that cocaine is one drug that he

acknowledges causes both heart attack or myocardial infarction and stroke. (TR p. 110.)

Dr. Gregory William Albers, who testified live as a defense expert, was asked whether he agrees that some people who take PPA could get extreme elevations in blood pressure (TR p. 88), and Dr. Albers answered as follows (TR pp. 88-92, both inclusive):

"A. It's a very interesting question, because my thinking on this changed a bit when I went back to the Lake article. When I wrote my original report, where I had a sentence like that, it was based on my reading of an article by Lake, where he indicated a number of patients had malignant hypertension associated with PPA. Then I went back later after I had written the article, and I pulled every reference that was—where Lake said malignant hypertension had occurred in a PPA case, and I was quite amazed to find that not one of those patients had malignant hypertension, and that most of those patients, the blood pressure was either normally or minimally elevated.

"So, my opinion would have changed a bit after I reviewed more detail, the original sources.

"Q. Let's take a look at your report, put up report of Dr. Albers, paragraph 38. This is the original report you wrote in the MBL litigation that you're referring to?

"A. This is what I am just talking about right now. Correct.

"Q. And take a look at that paragraph, paragraph 38 on page 13 of your report—

"A. Correct.

"Q. —where you stated, abrupt severe elevation in blood pressure has also been suggested as potential cause of brain hemorrhages following consumption of PPA?

"A. Correct.

"Q. And you say, rare individuals develop stream (extreme) elevations in blood pressure following administration of PPA?

"A. Correct.

"Q. So, you're now changing that opinion?

"A. Well, what I am saying is that part of that opinion was based quite heavily on the review article by Lake, and that the Lake article reported a number of patients that took PPA and developed what's called hypertensive encephalopathy, which is a very extreme elevation in blood pressure. So, I was relying, to a great extent, on that article being correct. And then subsequently, having more time to go back and really examine these cases in detail, I pulled all the individuals cases from Lake where hypertensive encephalopathy was reported, and was failure (fairly) astonished to find that in many of those case reports, the blood pressure was absolutely normal, there was not even an elevation in blood pressure.

"So, I certainly would write that sentence different today now that I have had more opportunity to review more detailed literature.

"Q. After you went back and you reviewed Dr. Lake's report, and changed your opinion, did you write a supplemental report, notify counsel for the defendant that you had changed your opinion on this issue?

"A. Well, I certainly discussed it with the attorneys, and then this issue came up again in Seattle at the Dolbert (Daubert) hearings.

"Q. Well, in Seattle you didn't indicate that you had changed your opinion on this issue, did you?

"A. I wasn't, I think, asked specifically. I think this is a part in the transcript where I indicated that I had rereviewed Lake, and found that the severe degrees of blood pressure elevation that I thought had been reported, based on reading his article, actually did not occur.

"Q. Let's take a look at the last sentence of that article. Furthermore, patient who ingests overdose of PPA can have extreme elevation in blood pressure. Again, you said it again.

"A. Again, this was before reviewing Lake, where it was lot of the cases who reportedly had the hypertensive encephalopathy had major overdoses.

"Q. Don't you think it would be important for purposes have (of) this litigation for you to write a supplemental report, saying that paragraph 38 of my original report is now wrong?

"A. I wasn't asked to write a supplemental report. If I was asked to write a new report, I would structure this paragraph a bit different.

"Q. Whether you were asked to or not, this is a significant change in your opinion, is it not?

"A. Maybe I am not as familiar with the legal proceeding as you are. I was under no impression that everytime I learned something new, I needed to addend to my report.

"Q. If you write a medical article, yourself, and you later learn that something you wrote in that article is not correct, you're going to write an article or a supplement to that, saying that I was wrong?

"A. Well, if the opportunity comes up to address the topic again, certainly. Every time people update book chapters, they update things. They don't put out some alert every time they realize that there's been some change in their thinking on the topic. I mean, medicine evolves over time as more data comes to light."

Dr. Albers agrees that high blood pressure is a risk factor that is common for both hemorrhage and ischemic strokes. (TR pp. 87-88.)

This court is concerned about the change in the testimony of Dr. Albers from his written report without having submitted a supplemental report providing the change in testimony and the reasons for such change.

This court finds that the methodology utilized by the plaintiffs' experts on this issue is the same as used in hospitals across the country, taught at medical schools and described in medical textbooks.

This court finds that the plaintiffs have carried their burden of proof at this *Frye* hearing and that the weight of the evidence establishes that the plaintiffs' experts may testify that PPA increases the risk of ischemic stroke in any segment of our society because there is general acceptance of the methodology of extrapolation utilized by those experts and supported by the lines of evidence, materials, textbooks and case reports, so that there is objective evidence supporting the methodology. In addition, the methodology of extrapolation by comparison,

here utilized, is supported by a strong logical inference, to wit: that drugs of that same class, which to some extent bring about effects which in turn contribute to ischemic stroke, may be compared as to effect.

Plaintiffs' experts, like any other expert witnesses, may be cross-examined during trial to distinguish the evidence that they rely upon in applying their opinion from the scientific literature to the facts in a given trial. Defendants' own experts may also offer opinions that challenge plaintiffs' experts' conclusions, thus creating questions for the jury to weigh and ultimately resolve.

## ORDER

And now, September 2, 2003, after review of defendants' motion pursuant to Pa.R.C.P. 207.1 to exclude testimony of plaintiffs' generic experts, defendants' brief in support of said motion and defendants' exhibits, plaintiffs' responses and exhibits and attachments thereto, defendants' reply brief and exhibit volumes 1-3, plaintiffs' sur-reply to defendants' reply brief and supplement thereto, the studies, reports and literature submitted by all parties to this court pursuant to this court's order dated May 30, 2003, and after a *Frye* evidentiary hearing and argument, the following findings and order are set forth below and in the accompanying opinion as to the issues remaining pursuant to the order of this court dated May 30, 2003:

(1) Plaintiffs' generic experts are permitted to testify and render opinions that PPA increases the risk of hemorrhagic stroke in the male population 18 years of age and older because the methodology and principles pro-

ducing such proposition, to wit, extrapolation, are generally accepted by the relevant scientific community; and, thus, *Frye* is satisfied in this regard.

(2) Plaintiffs' generic experts are permitted to testify and render opinions that PPA increases the risk of hemorrhagic stroke in the female population over the age of 49 years because the methodology and principles producing such proposition, to wit, extrapolation, are generally accepted by the relevant scientific community; and, thus, *Frye* is satisfied in this regard.

(3) Plaintiffs' generic experts are permitted to testify and render opinions that PPA increases the risk of ischemic stroke in any segment of our society because the methodology and principles producing such proposition are generally accepted by the relevant scientific community; and, thus, *Frye* is satisfied in this regard.