## Campbell-Perfilio v. PennDOT

C.P. of Lackawanna County, no. 96 CV 3784.

*James F. McBride,* for plaintiff.
*James P. Kearney,* for defendant PennDOT.
*Robertson B. Taylor,* for defendant Yamaha Motor Corp. USA.
*Alan S. Gold,* for defendant Lo-Jan Travel Center Inc.

*Debra P. Fourlas,* for defendant Vance & Hines Racing.

NEALON, *J.,* June 10, 2004—Two defendants in this products liability litigation have filed motions to preclude the testimony of the plaintiff's experts on the grounds that it is based upon novel scientific evidence which is not generally accepted by the professional engineering community. The materials submitted for review under Pa.R.C.P. 207.1(a) indicate that the relevant scientific community generally recognizes as acceptable the testing and methodology used by the plaintiff's experts to formulate their opinions. Thus, the defense motions to bar the testimony of the plaintiff's experts will be denied.

## I. FACTUAL BACKGROUND

This wrongful death action arises out of a fatal motorcycle accident which occurred on August 6, 1994, when the 20-year-old decedent, Christopher Perfilio, was operating a 1992 "Super Sport FZR 600" motorcycle on State Road 2010 (Dalton Road) in Overfield Township, Wyoming County. Perfilio's motorcycle was manufactured by Yamaha Motor Corp. USA and equipped with an exhaust system that was designed and distributed by Vance & Hines Racing. The Vance and Hines exhaust system was promoted by Yamaha and installed on the Perfilio motorcycle by Lo-Jan Travel Center Inc. which was also the retail seller of the motorcycle. (Dkt. entry nos. 164 and 174, ¶¶1-3.)

Perfilio alleges that defects in the motorcycle's exhaust system caused the engine to lose power and create in-

creased drag on the rear wheel, thereby resulting in premature locking of the rear wheel and eventual loss of control at the time of the accident. In addition to products liability claims which have been asserted against Yamaha, Lo-Jan and Vance & Hines, Perfilio has advanced a claim against the Pennsylvania Department of Transportation for negligent design and maintenance of Dalton Road. (*Id.,* no. 47.) Perfilio originally sued Lo-Jan's principal, Ralph L. Parke, as well, but by order dated March 9, 2001, Judge Trish Corbett entered summary judgment in favor of Parke. (*Id.,* no. 136.) Perfilio subsequently settled all claims against Vance & Hines pursuant to a joint tort-feasor release. (*Id.,* nos. 113-14.)

Perfilio's strict liability and negligence claims against Yamaha and Lo-Jan are predicated upon four expert reports which have been authored jointly by Charles Edwin Neu P.E., and Bayard T. McWilliams P.E., of Forensic Sciences Inc.[1] According to their curriculum vitae which are attached to Perfilio's submissions, Neu and McWilliams have bachelors degrees and masters degrees in metallurgical, mechanical and aeronautical engineering with technical and professional experience in vehicle and motorcycle accident reconstruction and the function of those vehicles' component parts. (*Id.,* exhibit F.) Perfilio's experts have opined that, as a result of an exhaust defect, the motorcycle engine hesitated and caused the rear wheel

---

1. Neu and McWilliams also prepared a fifth report dated September 13, 2000, addressing PennDOT's alleged liability for the faulty configuration of Dalton Road which purportedly contributed to the decedent's accident. (*Id.,* no. 174, exhibit D.) The Neu and McWilliams report of September 13, 2000, is not the subject of the Rule 207.1 motions.

to lock during braking and ultimately led to Perfilio's loss of control at the time of his fatal accident. (*Id.,* exhibits A-C, E.)

In their "preliminary report" dated February 20, 1998, Neu and McWilliams itemize the reports, depositions, documents and photographs that they reviewed and confirm that Neu personally examined the subject motorcycle. (*Id.,* exhibit A, p. 2.) Based upon their review of those materials and inspection of the motorcycle, they conclude that the Vance & Hines exhaust system which was installed by Lo-Jan caused the motorcycle to malfunction and "behave unpredictably during braking." The initial expert report references the deposition of the decedent's brother who testified that "[t]he engine stalled when started cold and 'stuttered and almost stalled' when operated in the speed range of 5,000 to 7,000 RPM." The decedent reportedly returned the motorcycle to Lo-Jan on several occasions "in order to have the improper engine operation corrected," but to no avail. Neu and McWilliams note that the motorcycle's "sparkplugs had to be replaced because they were completely black" and state that "[t]his is a sign of a mixture problem." They opine in their first report that as a result of this engine failure, the motorcycle's rear wheel "can slow more quickly than expected or lock up prematurely" and "can cause the operator of the motorcycle to lose control." (*Id.,* p. 3.) Perfilio's experts further conclude that "the improper operation of the engine was a substantial contributing factor in Christopher Perfilio's loss of control of the motorcycle as he approached the bend in the road" and that "to a reasonable degree of engineering certainty the improper operation of the motorcycle en-

gine after the installation of the Vance & Hines exhaust system was a substantial contributing factor in causing Christopher Perfilio's accident and fatal injuries." (*Id.,* pp. 3-4.)

Two months later, Neu and McWilliams generated a second report discussing the conduct of Yamaha and Vance & Hines. Observing that "Lo-Jan failed to properly calibrate the fuel and air mixture required for the proper functioning of the Yamaha motorcycle," they state "that Yamaha took no steps to determine whether Lo-Jan was qualified or capable of properly installing the Vance & Hines exhaust system with the Carburetor Jet Kit." (*Id.,* exhibit B, p. 1.) The two opine that Yamaha should not have provided a Vance & Hines exhaust system and jet kit option with the motorcycle "when it knew or should have known that Lo-Jan was unqualified or incapable of properly installing and calibrating the exhaust system." (*Id.*) Neu and McWilliams remark that following the installation of the Vance & Hines exhaust system, "riders of the motorcycle experienced a serious lack of power and 'bogging' of the engine" and "[t]he engine also experienced unusual sparkplug fouling for such low mileage." The experts reiterate that "the loss of power or stalling of the engine of a motorcycle such as occurred in this case can cause unexpected lock-up of the rear wheel during braking because of the increased drag on the wheel from the engine." In support of this conclusion, they note that during the post-accident examination of the motorcycle, "the exhaust system revealed unusual corrosion and damage not associated with the accident." (*Id.,* p. 2.)

Following their review of three additional depositions, Neu and McWilliams prepared a third report on December 18, 1998. In this supplemental report, they reason:

"If satisfactory performance of the engine required the rider to take specific actions and precautions in the use of the choke and to always operate the motorcycle at a high speed, then it was incumbent upon Yamaha to provide instructions and precautions to the owners of the motorcycles they manufactured. There is no indication that Yamaha did so. Also, a motorcycle that requires constant high speed operation is not practical for use on public roads and should not be sold as such." (*Id.,* pp. 1-2.)

Lo-Jan and Yamaha have filed motions pursuant to Pa.R.C.P. 207.1 seeking to exclude the testimony of Neu and McWilliams on the grounds that they allegedly rely upon novel scientific evidence and principles which are not generally accepted by the relevant scientific community. Lo-Jan's motion contends that "no scientific basis exists for the opinion of Neu and McWilliams" that an exhaust defect precipitated engine hesitation which caused the rear wheel to lock during braking. (*Id.,* no. 164, ¶17.) Yamaha similarly argues in its motion that "Neu and McWilliams' opinion that a stalled or improperly operating motorcycle engine can cause its back wheel to slow more quickly than expected or lockup prematurely is not based on any scientific methodology or testing . . . and is, therefore, inadmissible." (*Id.,* no. 161, ¶11.) Both motions are premised upon the reports of the defense experts, Robert R. Moderow, Dennis A. Toaspern, Warner W. Riley P.E., and Wade Bartlett P.E.

Vance & Hines' expert, Mr. Moderow, opines that "speeding is a major factor in this accident" and that the alleged "carburetion complaints (stalling and loss of power)" did not play "any role." (*Id.,* no. 164, exhibit C, pp. 1-2.) Based upon his experience with an exemplar motorcycle, he "disagree[s] with plaintiff's experts as stated in their report that stalling of the engine can cause the rear wheel to lock up." (*Id.,* p. 2.) Lo-Jan's expert, Mr. Toaspern, states that there was no "safety-of-operation defect" in the motorcycle and "no reason for Lo-Jan Travel Center to warn of nonexistent consequences of continued operation." (*Id.,* exhibit D, p. 6.) He also remarks:

"It is my opinion that the conclusions reached by the plaintiff expert, Forensic Sciences Inc., are erroneous in stating that a driveability problem, if it in fact existed, would cause an accident of this type. Upon entering a curve, such as found at the accident site, a motorcycle's throttle is normally in the closed or slightly open position as the rider decelerates under braking and downshifting. In this situation, any minor driveability problem would have a negligible effect on the stability of the bike and would certainly have no bearing on a capsize involving locked wheels. A locked wheel or wheels entering a turn are the standard indication of an attempt by a rider to correct an approach speed that is excessive for the radius of the turn and the rider's ability.

"It is a physical impossibility for a 'stuttering' or 'sputtering' engine to lock the rear wheel in the manner suggested by the Forensic Sciences Inc. report. For the engine to affect even a momentary deceleration of the rear wheel resulting in a 'chirp' from the tire, the rider must

downshift several times in rapid succession, allow the engine rpm to drop significantly and then quickly release the clutch. The resulting skid mark, if discernible at all, will be short, less than 10 feet. As the rear wheel gains traction, the engine rpm will rapidly rise, (to the mechanical limits of the engine), constraining the skid mark length. Absent an unusual external cause or a gross mechanical failure, at the speeds involved there simply is no mechanism available to lock the rear wheel for a significant amount of time other than the brakes." (*Id.,* p. 7.)

Yamaha's engineering expert, Warren W. Riley P.E., concludes that the motorcycle was not defective and also disputes "[t]he idea that an engine which 'stalls' can cause the rear wheel to lock and mark the pavement . . . ." Mr. Riley postulates that this theory "is without foundation and would be unheard of by those who understand motorcycle operation and basic vehicle engineering." (*Id.,* exhibit B, p. 3.) Finally, Lo-Jan's other expert, Wade Bartlett P.E., surmises:

"As an engineer involved in the study of motorcycle and other vehicular accidents, I am relatively familiar with the important scientific/engineering literature and studies relevant to this field, and I have not seen any support in such literature or studies for plaintiff's theory of causation of this accident. There is no published agreement among even a minority of experts in my field that an accident could happen in the manner that plaintiff's experts have theorized." (*Id.,* exhibit E, p. 4.)

It should be noted, however, that none of the defense experts have identified any authoritative studies, research

or literature which recognize their methodology and principles as generally accepted in the relevant engineering or scientific community.

In response to the defense motions, Neu authored another report on March 8, 2004, addressing "the methodology [Neu and McWilliams] used in the technical investigation that led to the conclusions we reached as to the condition of the motorcycle in the subject case." Neu states that the "conclusion that the fuel system of the motorcycle was improperly adjusted [is] based on descriptions of the condition of the sparkplugs." Neu explains that the sparkplugs "were replaced at 500 miles because they were fouled and again later because they were completely black." Referencing an exemplar manual prepared by Chrysler Corporation on engine performance, Neu indicates that "[t]he diagnosis of fuel system problems based on the appearance of sparkplugs is described in most manuals on internal combustion engines." (*Id.*, exhibit E, p. 1.)

With regard to their opinions "as to the effect of loss of power or stalling of the engine on the braking of the motorcycle," Neu maintains that their conclusions are based upon their professional "knowledge that an internal combustion engine that is not under power creates a greater drag on the powered wheel than one that is under power." To that end, he expounds:

"When an engine loses power or stalls during brake application, the additional drag from the engine is added to the drag from the brake so that the rear wheel slows more rapidly than it would if the engine were running

normally. The more rapid than normal slowing of the rear wheel will cause it to lock up prematurely and skid.

"The increased drag from an unpowered engine is due to resistance of the engine to turning because of compression in the cylinders. The source of drag is explained in the attached description of the operation of Otto cycle engines (the type of engine that powered the motorcycle) in *The Encyclopedia Americana* and the attached description of driveline drag from *Fundamentals of Vehicle Dynamics* by Thomas D. Gillespie. In the case of the motorcycle, we measured the drag on the rear wheel from the unpowered engine by rotating the rear wheel with a torque wrench. A torque wrench can be used to measure the resistance to turning of a shaft, in this case the rear wheel shaft." (*Id.*, pp. 1-2.)

Neither Lo-Jan nor Yamaha has submitted supplemental materials from their experts challenging the validity or reliability of the literature cited by Neu in his final report of March 8, 2004. Rather, they contend that "the materials attached to the Neu report fail to demonstrate that the experts, in extrapolating therefrom utilized any generally-accepted scientific methodology in the field of motorcycles or motorcycle accident investigations to determine the cause of this accident." (*Id.*, no. 177, p. 8.) The moving defendants alternatively argue that in the event that their Rule 207.1 motions are denied, they are entitled to supplemental expert discovery under Pa.R.C.P. 4003.5(a)(2) on the basis that Neu and McWilliams have not disclosed their exact measurements of "the drag on the rear wheel from the unpowered engine." (*Id.*, p. 11.)

## II. DISCUSSION

### (A) *Standard of Review*

Questions concerning the admission of novel scientific evidence are governed by the "general acceptance" rule which was originally articulated in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923), later adopted in Pennsylvania in *Commonwealth v. Topa,* 471 Pa. 223, 231-32, 369 A.2d 1277, 1281 (1977), and recently reaffirmed as the controlling evidentiary standard in this Commonwealth. See *Grady v. Frito-Lay Inc.,* 576 Pa. 546, 839 A.2d 1038, 1045-46 (2003). Pa.R.C.P. 207.1 sets forth the procedure to be followed if a party seeks "to exclude expert testimony which relies upon novel scientific evidence, on the basis that it is inadmissible under Pa.R.E. 702 or 703," and authorizes the trial court to decide the motion prior to trial or to defer the matter until trial. Since Perfilio will be unable to satisfy her burden of proof in this case if the testimony of Neu and McWilliams is precluded at trial, we will address this potentially dispositive evidentiary issue prior to the trial which is scheduled to begin on October 4, 2004. See Pa.R.C.P. 207.1(a)(3) (stating that "the court shall initially review the motion to determine if, in the interest of justice, the matter should be addressed prior to trial.").

Under *Frye* and Rule 207.1, the proponent of expert scientific evidence bears the burden of establishing that the methodology that an expert has used is generally accepted by the relevant scientific community. *Grady,* 839 A.2d at 1045; *Cassell v. Lancaster Mennonite Confer-*

*ence,* 834 A.2d 1185, 1189 (Pa. Super. 2003). As an exclusionary rule of evidence, the *Frye* rule "must be construed narrowly so as not to impede admissibility of evidence that will aid the trier of fact in the search for truth." *Trach v. Fellin,* 817 A.2d 1102, 1104 (Pa. Super. 2003) (en banc), *appeal denied,* 2004 WL 587650 (Pa. 2004). The trial court's ruling under Pa.R.C.P. 207.1 "should not be disturbed on appeal unless the trial court abuses its discretion" which "may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill will, or such lack of support so as to be clearly erroneous." *Grady,* 839 A.2d at 1046.

## (B) *Novelty of Methodology*

Pennsylvania appellate courts have cautioned "that a *Frye* analysis is not triggered every time science enters the courtroom." *Commonwealth v. Dengler,* 843 A.2d 1241, 1243 (Pa. Super. 2004). Indeed, if the trial courts were required to apply *Frye* every time that a scientific expert rendered an opinion, it would produce "a result that is nothing short of Kafkaesque to contemplate." *Trach,* 817 A.2d at 1110. For that reason, this exclusionary rule of evidence "applies only when a party wishes to introduce *novel scientific evidence obtained from the conclusions of an expert scientific witness.*" *Cummins v. Rosa,* 846 A.2d 148, 150 (Pa. Super. 2004) (emphasis in original); *M.C.M. v. Milton S. Hershey Medical Center,* 834 A.2d 1155, 1158 (Pa. Super. 2003). To be considered "novel," the scientific evidence "must be something different from 'new' which could be original, striking,

unusual or strange." *Dengler, supra* (expert psychologist's opinion whether sex offender met criteria for sexually violent predator was not novel scientific evidence subject to *Frye*).

Furthermore, only the principles and methodology that the expert employs, not the conclusions [s]he reaches, must be generally accepted by scientists in the relevant field. *Grady,* 839 A.2d at 1045; *Trach,* 817 A.2d at 1114. In determining whether a particular scientific process is generally accepted, the court must consider whether the proffered evidence stems from scientific research which has been conducted in a fashion that is generally recognized as being sound rather than "the fanciful creation of a renegade researcher." *M.C.M.,* 834 A.2d at 1158-59; *Tucker v. Community Medical Center,* 833 A.2d 217, 224 (Pa. Super 2003). However, the *Frye* test does not "require an optimal methodology, just an accepted one." *Cassell,* 834 A.2d at 1190. Additionally, properly qualified experts may rely upon their individual professional experience in conducting their analysis and formulating an opinion. See *e.g., Cummins,* 846 A.2d at 151 (*Frye* did not bar experts in malpractice action from relying "upon their respective personal expertise to reach a conclusion regarding the source of [patient's] injuries."); *Tucker,* 833 A.2d at 224-25 (expert's opinion that catheter could not perforate urethral wall was based upon his urological experience and not subject to *Frye*); *Commonwealth v. Passarelli,* 789 A.2d 708, 715 (Pa. Super. 2001) (physician's diagnosis of "shaken baby syndrome" was opinion testimony, not scientific evidence within the meaning of *Frye*); *Smith v. Grab,* 705 A.2d 894, 900-901 (Pa. Super. 1997) (oncologist's opinion regarding

effect of three-week delay in diagnosing breast cancer was based upon his oncological experience, and the "failure to cite an article or text on point goes to the weight of his testimony, not its admissibility."); *Joyce v. Boulevard Physical Therapy and Rehabilitation Center,* 694 A.2d 648, 656 (Pa. Super. 1997), *appeal denied,* 559 Pa. 771, 740 A.2d 1148 (1999) (orthopedic expert's opinion was based upon 30 years of experience and it was unnecessary to "cite to treatises and medical periodicals to support his articulation of the standard of care.").

In support of their conclusion that an exhaust system defect resulted in a loss of engine power that created increased drag and caused locking of the rear wheel, Neu and McWilliams cite the physical findings noted on inspection of the motorcycle, their measurement of the rear wheel drag from an unpowered engine, and literature which has not been challenged by the defense experts. Observing that the diagnosis of fuel system problems based upon the condition of sparkplugs is recognized by "most manuals on internal combustion engines," Neu and McWilliams reference the "completely black" appearance of the motorcycle's sparkplugs and their early replacement as evidence of the failure to properly calibrate the fuel and air mixture in the motorcycle's exhaust system.[2] With regard to their conclusion that the resultant loss of power placed greater drag on the powered wheel and caused premature locking of the rear wheel during braking, Perfilio's experts cite the unusual corrosion of

2. Perfilio's experts also considered deposition testimony which indicated that riders of the subject motorcycle were required to use the choke and operate the motorcycle at high speeds in order to avoid sputtering or stalling of the engine.

the exhaust system upon post-accident inspection, their engineering "knowledge that an internal combustion engine that is not under power creates a greater drag on the powered wheel," their measurement of the rear wheel drag with a torque wrench, and articles discussing the source and effect of drag in Otto Cycle engines.

The defense experts do not dispute the principles employed by Neu and McWilliams in diagnosing an alleged faulty calibration of the fuel system; rather, they focus their *Frye* attack on the proffered connection between stalling of the engine and locking of the rear wheel. In that regard, Moderow, Toaspern and Riley merely contest the validity of the conclusions reached by Neu and McWilliams as opposed to the methodology or principles employed to arrive at those conclusions. Moderow states that he "disagree[s] with plaintiff's experts . . . that stalling of the engine can cause the rear wheel to lock up," while Toaspern characterizes the conclusions at issue as "erroneous." Riley likewise attacks the conclusion "that an engine which 'stalls' can cause the rear wheel to lock and mark the pavement" as "unheard of by those who understand motorcycle operation and basic vehicle engineering." None of these experts discuss the testing or methods used by Neu and McWilliams to formulate their conclusions, nor do they denounce the supporting literature cited by Perfilio's experts. Since *Frye* does not require Perfilio to "prove that the scientific community has also generally accepted the expert's conclusion," *Grady,* 839 A.2d at 1045, Moderow, Toaspern and Riley do not provide a basis for excluding the testimony of Neu and McWilliams under Pa.R.C.P. 207.1.

Only Bartlett arguably addresses the issue of whether the methodology utilized by Neu and McWilliams is generally accepted by the relevant scientific community. Riley claims that he is "relatively familiar with the important scientific/engineering literature and studies relevant to this field" and has "not seen any support in such literature or studies for plaintiff's theory of causation of this accident." However, after Neu subsequently identified the scientific publications and engineering principles which reportedly recognize Neu and McWilliams' methodology as reliable, Bartlett did not issue a supplemental report contesting the validity or authoritativeness of those articles or precepts. Consequently, the *Frye* record submitted for review is devoid of any direct challenge to the principles and literature referenced in the Neu report dated March 8, 2004.

The parties' submissions do not establish that Neu and McWilliams utilized novel methodologies which are generally regarded as unsound by the engineering community. Yamaha and Lo-Jan contend that the testing underlying their experts' hypotheses is superior to that employed by Perfilio's experts since the defense experts analyzed an exemplar motorcycle's engine and brakes during actual operation whereas Neu and McWilliams measured the subject motorcycle's drag and resistance while stationary. But as stated above, *Frye* does not "require an optimal methodology just an accepted one," *Cassell, supra,* and the record does not reflect that the diagnostic techniques used by Neu and McWilliams have been disavowed by the relevant scientific community.[3]

3. Although the moving defendants also attack Neu and McWilliams' use of extrapolation in forming their opinions, the *Trach* court recog-

Simply because the defense experts disagree with the scientific theories proffered by Perfilio's experts does not mean that Neu and McWilliams' testimony is subject to preclusion under Rule 207.1. If expert opinions were declared inadmissible on that basis, trial judges would be transformed from gatekeepers for the introduction or exclusion of novel scientific evidence to factfinders obligated to choose between conflicting expert opinions and to determine which opinion is more credible or reliable. Determinations of that nature are the sole responsibility of the jury. The defense's criticisms of the foregoing conclusions and testing affect the weight of the testimony by Perfilio's experts rather than its admissibility. See *Cummins,* 846 A.2d at 151; *Cassell,* 834 A.2d at 1190. Accordingly, the motions seeking to exclude the expert testimony of Neu and McWilliams under Pa.R.C.P. 207.1 will be denied.[4]

## ORDER

And now, June 10, 2004, upon consideration of the motions of Yamaha Motor Corporation USA and Lo-Jan

nized extrapolation as a methodology which is generally accepted in the scientific community and thus sufficiently reliable under *Frye.* See *Trach,* 817 A.2d at 1115-19.

4. Since the moving defendants have not demonstrated the requisite good cause to justify supplemental expert witness discovery after the certificate of readiness has been filed and this matter has been scheduled for trial, see Lacka. Cty. R.C.P. 214(b) ("[n]o certificate of readiness may be filed until all discovery in the case has been completed and all depositions for use at trial have been scheduled or completed"), the defense's alternative motion to conduct such discovery under Pa.R.C.P. 4003.5(a)(2) will be denied. See *Augustine by Augustine v. Delgado,* 332 Pa. Super. 194, 205-206, 481 A.2d 319, 325 (1984); *Robbins v. Rahimzadek,* 54 D.&C.4th 221, 223-24 (Alleg. Cty. 2001).

Travel Center Inc., to exclude the testimony of Charles Edwin Neu P.E., and Bayard T. McWilliams P.E., pursuant to Pa.R.C.P. 207.1, or in the alternative to conduct additional expert witness discovery under Pa.R.C.P. 4003.5(a)(2), the memoranda of law submitted by the parties, and the materials and oral argument presented for review, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that:

(1) The motions of defendant Yamaha Motor Corporation USA and Lo-Jan Travel Center Inc. to exclude the testimony of Charles Edwin Neu P.E. and Bayard T. McWilliams P.E. pursuant to Pa.R.C.P. 207.1 are denied; and

(2) Defendants' alternative motions to conduct further expert witness discovery pursuant to Pa.R.C.P. 4003.5(a)(2) are denied.